1 ALDEN F. ABBOTT
General Counsel

2

3 J. RONALD BROOKE, JR. (MD Bar No. 0202280002)
RUSSELL DEITCH (CA Bar No. 138713)
Federal Trade Commission

4 600 Pennsylvania Ave., N.W., CC-8528
Washington, DC 20580

5 (202) 326-3197 (fax)
rdeitch@ftc.gov

6 jbrooke@ftc.gov
(202) 326-3484 (Brooke)

7 (202) 326-2585 (Deitch)
Attorneys for Plaintiff Federal Trade Commission

8

FILED ___ LODGED
___ RECEIVED ___ COPY

JUL 16 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>HITE MEDIA GROUP, LLC, a Michigan limited liability company, also d/b/a Premium Grants and PremiumGrants.com;<br><br>PREMIUM BUSINESS SOLUTIONS, LLC, an Arizona limited liability company, also d/b/a Premium Services, Premium Grants, and PremiumGrants.com;<br><br>PREMIUM DOMAIN SERVICES, LLC, an Arizona limited liability company, also d/b/a Premium Services, Premium Grants, and PremiumGrants.com;<br><br>2 UNIQUE, LLC, an Arizona limited liability company, also d/b/a Unique Services, Unique Grants, UniqueGrants.com, and Grant Support;<br><br>AMAZING APP, LLC, an Arizona limited | Case No. CV-18-2221-PHX-SPL<br><br>**COMPLAINT FOR PERMANENT INJUNCTIVE AND OTHER EQUITABLE RELIEF**<br><br>**Filed Under Seal**<br><br>SEALED |

1

liability company;

MICHAEL FORD HILLIARD, individually and as the owner and manager of Amazing App, LLC, and as a *de facto* manager and a beneficial owner of Hite Media Group, LLC, Premium Business Solutions, LLC, Premium Domain Services, LLC, and 2 Unique, LLC;

MICHAEL DE ROSA, individually and as a *de facto* manager of Hite Media Group, LLC, Premium Business Solutions, LLC, Premium Domain Services, LLC, and 2 Unique, LLC;

SHAWN STUMBO, individually and as an agent, owner, and manager of Premium Domain Services, LLC;

TIFFANY HOFFMAN, individually and as an member, officer, agent, and owner of 2 Unique, LLC;

JEREMY SILVERS, individually and as an owner and manager of Premium Business Solutions, LLC.

      Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, the appointment of a receiver, an asset freeze, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule

2

("TSR"), 16 C.F.R. Part 310, in connection with the sale and offering for sale of grants services.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(1), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

## SUMMARY OF THE CASE

4. Defendants bilk consumers by deceptively marketing and selling bogus grants services. They falsely represent that consumers who purchase their services are likely to obtain tens of thousands of dollars in grant money that the consumers can use for personal expenses, such as repaying credit card and other debt, home repairs, and medical expenses. Defendants' false representation violates Section 5 of the FTC Act and Section 310.3(a)(4) of the TSR. Consumers, many of whom are elderly or disabled, have lost millions of dollars to this scheme.

## PLAINTIFF

5. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC is also charged with enforcement of the Telemarketing Act, 15 U.S.C. §§ 6101-6108, under which the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive or abusive telemarketing practices.

6. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement

3

of ill-gotten monies, the appointment of a receiver, and an asset freeze. 15 U.S.C. §§ 53(b), 6012(c), and 6105(b).

### DEFENDANTS

7. **Defendant Hite Media Group, LLC** ("Hite Media"), also doing business as Premium Grants and PremiumGrants.com, is a Michigan limited liability company with mailing addresses at 1887 Holton Rd. Suite D174, Muskegon, MI 49445 and 6040 E. Main St. #127, Mesa, AZ 85205. Hite Media transacts or has transacted business in this district and throughout the United States. At times material to this Complaint, acting alone or in concert with others, Hite Media has advertised, marketed, and sold grant services to consumers throughout the United States.

8. **Defendant Premium Business Solutions, LLC** ("PBS"), also doing business as Premium Services, Premium Grants, and PremiumGrants.com, is an Arizona limited liability company with mailing addresses at 1616 E. Main Street #210, Mesa, AZ 85203 and 625 W Southern Ave. Suite E, Mesa, AZ 85210. PBS has used the URL PremiumSolutions.us. PBS transacts or has transacted business in this district and throughout the United States. At times material to this Complaint, acting alone or in concert with others, PBS has advertised, marketed, and sold grant services to consumers throughout the United States.

9. **Defendant Premium Domain Services, LLC** ("Premium Domain"), also doing business as Premium Services, Premium Grants, and PremiumGrants.com, is an Arizona limited liability company. Premium Domain has used the URL PremiumDomainServices.us and the mailing address 6040 E. Main St. #127, Mesa, AZ 85205. Premium Domain transacts or has transacted business in this district and throughout the United States. At times material to this Complaint, acting alone or in concert with others, Premium Domain has advertised, marketed, and sold grant services to consumers throughout the United States.

4

10. **Defendant 2 Unique, LLC** ("2 Unique"), also doing business as Unique Services, Unique Grants, UniqueGrants.com, and Grant Support, is an Arizona limited liability company with a mailing address of 2942 N. 24th St. Suite 114-566, Phoenix, AZ 85016. 2 Unique has operated out of 2720 E. Thomas Rd. C150, Phoenix, AZ 85016. 2 Unique transacts or has transacted business in this district and throughout the United States. At times material to this Complaint, acting alone or in concert with others, 2 Unique has advertised, marketed, and sold grant services to consumers throughout the United States.

11. **Defendant Amazing App, LLC** ("Amazing App") is an Arizona limited liability company with a registered address at 1616 E. Main St. #210, Mesa, AZ 85203. Amazing App has also used 6040 E. Main St. #127, Mesa, AZ 85205 as a contact address and has operated out of 2720 E. Thomas Rd. C150, Phoenix, AZ 85016 and an office at 14040 N. Cave Creek Rd., Phoenix, AZ 85022. Amazing App transacts or has transacted business in this district and throughout the United States. At times material to this Complaint, acting alone or in concert with others, Amazing App has advertised, marketed, and sold grant services to consumers throughout the United States.

12. **Defendant Michael Ford Hilliard** ("Hilliard"), also known as Michael Ford, is the owner and manager of Amazing App and manager or *de facto* manager, and beneficial owner of, Hite Media, PBS, Premium Domain, and 2 Unique. At times material to this Complaint, acting alone or in concert with others, Hilliard has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Hilliard resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

5

13.     **Defendant Michael De Rosa** is a manager or *de facto* manager of PBS, Premium Domain, and 2 Unique. At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant De Rosa resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

14.     **Defendant Shawn Stumbo** is an agent, owner, and manager of Premium Domain. At times material to this Complaint, acting alone or in concert with others, Stumbo has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Stumbo resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

15.     **Defendant Tiffany Hoffman** is a member, officer, agent, and owner of 2 Unique. At times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Hoffman resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

16.     **Defendant Jeremy Silvers** is a manager, member, and owner of PBS. At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Silvers resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

**COMMON ENTERPRISE**

17.     Defendants Hite Media, PBS, Premium Domain, 2 Unique, and Amazing App (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below. Corporate Defendants have conducted the business practices described herein through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, office locations, mailing addresses, and phone numbers, and that commingled funds. Because the Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendants Hilliard, De Rosa, Stumbo, Hoffman, and Silvers have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants.

**COMMERCE**

18.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' BUSINESS ACTIVITIES**

19.     Since at least mid-2014, Defendants have operated a deceptive grant telemarketing scheme from call centers in the Phoenix area.

20.     Defendants have operated under numerous names, including Premium Grants, Premium Services, Unique Grants, and Unique Services. They have often created new companies or business names after an existing one generated significant consumer complaints, lost a merchant account, or was subject to an inquiry or sent cease and desist demands from state attorney generals' offices.

21.     Defendants Hilliard, De Rosa, Hoffman, and Silvers were managers of, or associated with, entities that were shut down by, or received cease and desist

demands from, state regulators because of allegations that those entities made misrepresentations to consumers about the likelihood of consumers obtaining thousands of dollars in grants.

### Defendants Sales Pitch

22. Defendants call consumers and represent that the consumers are eligible for, and with Defendants' assistance will likely receive, $10,000 or more in grants from government, corporate, or private grantors.

23. Some of the consumers that Defendants call visited websites associated with Defendants, such as PremiumGrants.com and UniqueGrants.com. These websites include claims about the availability of billions of dollars in grant money for groups such as, small business, women, minorities, and seniors. Both PremiumGrants.com and UniqueGrants.com allow consumers to enter their phone number and email address into a contact form for the purpose of being contacted about grant funding.

24. Defendants often tell consumers that multi-billion dollar corporations fund millions of dollars in grants to individuals, like the consumers. They often state that businesses provide such grants as tax write offs and refer to such grants as "stimulus grants."

25. Defendants routinely represent that the consumers can use the grant money to repay credit card and other debt, make home improvements and repairs, pay medical expenses, purchase automobiles, or for other personal expenses.

26. Defendants often tell elderly or disabled consumers, veterans, single mothers, and consumers with large amounts of debt, that they are eligible for $10,000 to $20,000 in grant money based on these qualifications alone.

27. In numerous instances, Defendants tell consumers they are eligible for grants ranging from $10,000 to $100,000 dollars. Defendants have represented to

consumers that they have a near 100% success rate in obtaining $10,000 or more in grant money for consumers to use for personal expenses.

28. Defendants typically charge consumers fees up front, ranging from $295 to at least $4,995, purportedly for Defendants' work on securing the grant money for the consumers.

29. Defendants tell consumers that after they pay Defendants, Defendants will send the consumers a grant workbook and schedule the consumer for four to six "training sessions" with a "grant specialist" to help the consumer complete the grant workbook.

30. In numerous instances, Defendants tell consumers during the sales call that the consumers will receive the grant money within 30 to 90 days of completing the "training."

31. Defendants frequently reassure consumers who express concerns about paying Defendants' large fees that, to finance the fees, they will only have to make the minimum monthly payment on their credit cards for two or three billing cycles before receiving $10,000 or more in grant money.

32. Defendants have obtained payments from consumers via credit or debit card, typically over the phone, or by consumers mailing Defendants checks or money orders.

33. Contrary to Defendants' representations, consumers are unlikely to obtain thousands of dollars in grant money for personal expenses. In fact, in numerous if not most instances, consumers who pay Defendants' fees receive no grant money whatsoever.

34. After consumers pay Defendants' fees, Defendants typically email consumers an invoice, which often states that the consumers have purchased "Social Business Training."

35. Within a few days of collecting their upfront payment from consumers, Defendants typically mail the consumers a package including a "Welcome Letter" and a "training workbook." Defendants routinely instruct consumers to provide answers to the questions in the workbook, including why the consumer needs a grant and questions about the consumer's personal and financial information.

36. Within a week or two of mailing their package to consumers, Defendants typically call the consumers to schedule "grant training sessions."

37. In numerous instances, during the scheduling call or "training sessions," Defendants tell consumers that if the consumers pay an additional fee, Defendants will create an online profile for the consumer that will enable Defendants to obtain more grant money for the consumers than originally represented. In other instances, Defendants tell consumers that if the consumers pay an additional fee, Defendants will be able to obtain the grant money for the consumer faster.

38. In numerous instances, during the "grant training sessions," consumers have informed Defendants that they intend to use the grant money to pay credit card bills and other personal debt, repair their house, pay medical expenses, or buy a car. Defendants have often told consumers that Defendants routinely get grants for individuals for those purposes.

39. After consumers complete the "training workbook" and "training sessions," Defendants direct the consumers to mail the competed copy of the workbook to Defendants.

40. In many instances, once consumers have mailed their completed workbook to Defendants, Defendants tell consumers that it may take up to several months for Defendants to draft the grant proposal, send the proposal to the grantors, and obtain the grant money for the consumers.

41. In numerous instances, after waiting several months and not receiving tens of thousands of dollars in grant money, or getting any updates on the status of their

grants from Defendants, consumers contact Defendants, often via letters, telephone, or email.

42. In numerous instances, when consumers ask Defendants about the status of their grant money, Defendants initially tell the consumers to be patient. Defendants often also state that they are sending out more grant applications on the consumers' behalf to additional grantors.

43. After stringing inquiring consumers along for several months, Defendants often stop answering these consumers' calls and ignore their letters, voicemails, or emails.

44. In some instances, if a consumer attempts to get his or her money back by contacting his or her credit card company and initiating a chargeback, Defendants contact the consumer with threats, such as threats of collection actions, if the consumer does not cancel the chargeback request.

45. The vast majority of grants in the United States are awarded to non-profits, state and local governments, and other organizations or entities, not to individuals.

46. Grants awarded in the United States are rarely, if ever, available to individuals solely for personal expenses.

47. The "services" that Defendants market and sell are unlikely to allow consumers to obtain thousands of dollars in grant money that the consumers can use for personal expenses.

48. Since at least 2014, Defendants have taken more than $3 million from consumers through the conduct challenged in this Complaint.

## VIOLATIONS OF THE FTC ACT

49. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

50. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

### FTC Act Violations

51. In numerous instances, in connection with the marketing, offering for sale, or sale of grants opportunities, Defendants represent, directly or indirectly, expressly or by implication, that consumers who purchase and use Defendants' services are likely to receive government, corporate, or private grants worth thousands of dollars that the consumers can use for personal expenses.

52. The representation set forth in Paragraph 51 of this Complaint is false, misleading, or was not substantiated at the time the representation was made.

53. Therefore, Defendants' representation set forth in Paragraph 51 of this Complaint constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## DECEPTIVE TELEMARKETING CALLS
## IN VIOLATION OF THE TSR

54. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in 1994. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter. 16 C.F.R. Part 310.

55. Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. §§ 310.2(aa), (cc), and (dd).

56. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii). Likewise, the TSR prohibits sellers and telemarketers from making any false or misleading statements to induce a person to pay for goods or services. 16 C.F.R. § 310.3(a)(4).

12

Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### TSR Violations

57.   In numerous instances, in connection with the advertising, telemarketing, promoting, or offering for sale of grant opportunities, Defendants have misrepresented, directly or by implication, that consumers who purchase and use Defendants' services are likely to receive government, corporate, or private grants worth thousands of dollars that the consumers can use for personal expenses.

58.   The acts and practices of Defendants described in Paragraph 57 of this Complaint are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. §§ 310.3(a)(2)(iii) and (a)(4).

## CONSUMER INJURY

59.   Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

60.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and

the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, and the appointment of a receiver;

B. Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, refund of monies paid, and disgorgement of ill-gotten monies; and

D. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: *16 July*, 2018

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

J. Ronald Brooke, Jr.
Russell Deitch
Federal Trade Commission
600 Pennsylvania Ave., N.W., CC-2850
Washington, DC 20580
(202) 326-3395 (Fax)
(202) 326-3484 (Brooke)
(202) 326-2585 (Deitch)

Attorneys for Plaintiff